IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| J.G., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| vs. | : | |
| | : | FILE NO. _____ |
| TARA HOSPITALITY, LLC | : | |
| d/b/a GARDEN INN SUITES | : | |
| a/k/a THE GARDEN INN, | : | |
| and SHASHIREKHA SHETTY | : | JURY TRIAL DEMANDED, |
| | : | PURSUANT TO Fed.R.Civ.P. 38 |
| Defendants. | : | |

COMPLAINT FOR DAMAGES

COMES NOW Plaintiff in the above-styled action and hereby files her Complaint as follows:

1.

This case involves the sex trafficking of J.G. from on or around 2014 through on or around 2018 at the Garden Inn Suites a/k/a The Garden Inn ("The Garden Inn"), 6701 Shannon Parkway, Union City, Georgia 30291. The Plaintiff is identified only by her initials given the nature of the case to prevent public disclosure of her name.[1]

2.

Plaintiff's lawsuit against Defendants arises under The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a).

3.

The TVPRA authorizes lawsuits against perpetrators of trafficking **and** beneficiaries of trafficking. In this lawsuit, Plaintiff alleges that Defendants violated the beneficiary provision of the TVPRA. Plaintiff does not allege that Defendants perpetrated her sex trafficking.

---

[1] A Motion for Protective Order regarding Plaintiff's identity is being filed contemporaneously herewith.

4.

The beneficiary provision of the TVPRA provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA.  18 U.S.C. § 1595(a).

5.

Defendants violated § 1595(a) because Defendants "knowingly benefit[ed]" from "participation in a venture" that Defendants "knew or should have known [] engaged in an act in violation of" the TVPRA, namely: Defendants (i) rented rooms at The Garden Inn in which Plaintiff was sex trafficked to Plaintiff's trafficker, and sold goods, like condoms, to Plaintiff and Plaintiff's trafficker, (ii) profited from rental of the rooms and sale of the goods, and (iii) did so notwithstanding that Defendants knew or should have known that Plaintiff was a victim of sex trafficking at The Garden Inn.  As such, Defendants violated 18 U.S.C. § 1595(a) and are liable to Plaintiff for her damages under the TVPRA.

6.

Plaintiff was sex trafficked at The Garden Inn because Defendants chose to ignore, allow, condone, facilitate, assist, aid, and/or support her trafficker in his exploitation of Plaintiff and other girls and women.  Defendants are liable to Plaintiff for their actions and failures to act.

- 3 -

## PARTIES, JURISDICTION, AND VENUE

7.

Plaintiff J.G. is a citizen of the United States of America and a resident of the State of Indiana.  She consents to the jurisdiction of this Court.

8.

The Garden Inn's principal office address is 6701 Shannon Pkwy, Union City, Georgia 30291.  Its registered agent for service of process is Shashirekha Shetty, 6701 Shannon Pkwy, Union City, Georgia 30291, USA, where it can be served.[2]

9.

Defendant Shashirekha Shetty, on information and belief, resides at 10855 Chatburn Way, Duluth, GA, 30097, USA, where Defendant Shetty can be served.

10.

During the relevant period, Defendant Tara Hospitality and Defendant Shashirekha Shetty (hereinafter "Defendants") earned revenue from owning, operating, and/or managing The Garden Inn.  That revenue resulted from renting

---

[2] Whenever reference is made in this Complaint to any action, inaction, or conduct of the Defendants named in this Complaint, the allegation is that the Defendants engaged in the action, inaction, or conduct at issue by or through one or more of their respective officers, directors, agents, employees, or representatives who were engaged in the management, direction, control, or transaction of the ordinary business and affairs of the respective Defendants.

- 4 -

hotel rooms at The Garden Inn and selling goods (drinks, snacks, condoms, etc.) to customers, among other things.

11.

During the relevant period, Defendants earned revenue from renting hotel rooms to Plaintiff and Plaintiff's trafficker at The Garden Inn, including the rooms in which Plaintiff was victimized.

12.

During the relevant period, Defendants earned revenue from selling goods (drinks, snacks, condoms, etc.) to Plaintiff and her trafficker at The Garden Inn.

13.

On information and belief, during the relevant period, Defendants reviewed hotel performance data, room occupancy data, profitability data, online reviews, and other performance metrics in connection with managing and/or operating The Garden Inn.

14.

On information and belief, Defendant Tara Hospitality and Defendant Shetty are in a joint venture, partnership, and/or agency relationship. Defendants are directly liable for their own acts, omissions, and negligence, and vicariously liable for the acts, omissions, willful blindness, and/or negligence of their co-Defendant and their co-Defendant's agents and employees, as discussed herein. Defendants

breached duties imposed by law, assumed by contract, assumed by behavior, and/or voluntarily undertaken. Defendants are legally liable to Plaintiff.

15.

Jurisdiction and venue are proper as to Defendant Tara Hospitality and Defendant Shetty.  Further, Defendant Tara Hospitality and Defendant Shetty have been properly served with process in this action.

16.

This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims arising under 18 U.S.C. § 1595(a).

17.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the juridical district where this action is brought.

**<u>INTRODUCTION</u>**

18.

Plaintiff J.G. was trafficked for sex at The Garden Inn in violation of 18 U.S.C. § 1591.[3]

---

[3] 18 U.S.C. § 1591 criminalizes, among other things, sex trafficking.  18 U.S.C. 1595(a) provides a civil cause of action related to violations of 18 U.S.C. § 1591 against perpetrators of sex trafficking *and* beneficiaries of sex trafficking. Plaintiff's lawsuit arises under a beneficiary theory of liability.

19.

Sex trafficking includes recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, *or* soliciting a person for a "commercial sex act." 18 U.S.C. § 1591(a)(1), *et seq.*

20.

18 U.S.C. § 1591 defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

21.

Plaintiff was sex trafficked through use of "force, fraud, or coercion" by her trafficker and his associates. 18 U.S.C. § 1591(a)(1), *et seq.*

22.

Plaintiff was sex trafficked at The Garden Inn *both* when she performed commercial sex acts at The Garden Inn *and* before and after she performed those commercial sex acts—that is, when at The Garden Inn she was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited for a commercial sex act.

23.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and/or managed The Garden Inn.

24.

At all times relevant hereto, Defendants directed, operated, supervised, monitored, managed, and/or employed all employees, agents, representatives, managers, directors, and other staff at The Garden Inn, giving Defendants specific and direct knowledge of crimes at the hotel during the relevant period.

25.

Under the TVPRA, Defendants had a duty not to (1) knowingly benefit, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that Defendants knew or should have known, (4) engaged in an act in violation of the TVPRA.  To fulfill their duties under the TVPRA—that is, to obtain the actual or constructive knowledge a reasonable hotel owner and operator should have of its business[4]—Defendants needed to take reasonable steps to secure the property and monitor activity on the property, including but not limited to: inspecting and monitoring the hotel and its guests and visitors; providing sufficient security at the property; vetting, training, and supervising hotel staff; remediating the property in light of known criminal risks; and acting as a reasonable hotel would to deter and prevent commercial sex, crimes against women, sex crimes, and sex trafficking, among other crimes, to keep the property in a reasonably secure and safe

---

[4] *See Johnson St. Properties, LLC v. Clure*, 302 Ga. 51, 54 (2017) ("owner/occupier is generally on constructive notice of what a reasonable inspection conducted in the exercise of ordinary care would reveal.")

condition for guests and visitors alike. Defendants breached these duties, and in doing so, breached the TVPRA.

26.

During the period at issue, Defendants knew or should have known of the reasonable and common-sense signs, red flags, and policies to identify, address, and deter commercial sex crimes, prostitution, and sex trafficking at The Garden Inn, and to mitigate the risk of profiting from commercial sex crimes, prostitution, and sex trafficking at The Garden Inn, as required by federal law.

27.

Rather than implementing reasonable and common-sense steps to identify, address, and deter commercial sex crimes, sex trafficking, and prostitution at The Garden Inn, Defendants chose to take part in a common undertaking or enterprise involving risk and potential profit in violation of 18 U.S.C. § 1595(a).

28.

Defendants breached the TVPRA by negligently and/or willfully turning a blind eye to the open and obvious sexual exploitation of Plaintiff at The Garden Inn—and aiding her trafficker's illicit sex and drug trafficking operation at The Garden Inn—in exchange for commercial gain and in total disregard of the rights of Plaintiff.

29.

Defendants violated the TVPRA: by helping and assisting Plaintiff's trafficker carry out his booming drug and sex trafficking business at the hotel through providing protection and cover, acting as lookouts, and/or accepting bribes in exchange for permitting the exploitation of Plaintiff and other girls and women on the property; by renting Plaintiff's trafficker rooms for weeks and months when it knew or should have known that he was selling Plaintiff, other girls, and drugs out of those rooms; by failing to secure the hotel against known security and crime risks; by failing to take adequate measures to identify, address, and deter commercial sex crimes, prostitution, and sex trafficking at the hotel despite notice of the same; by failing to train their managers, employees, and staff to be on the lookout for reasonable and common-sense signs of commercial sex crimes, prostitution, and sex trafficking.  Through such actions and omissions, among others, Defendants ignored, allowed, condoned, facilitated, assisted, aided, and/or supported Plaintiff's trafficker in his exploitation of Plaintiff.

### A.    Plaintiff's Sex Trafficking at The Garden Inn

30.

Plaintiff was sex trafficked at the Garden Inn for extended periods from approximately 2014 to approximately 2018.

31.

When Plaintiff was trafficked at The Garden Inn, her trafficker rented rooms at the hotel in cash. The cash came, at least in part, from the booming sex and drug trafficking businesses he ran at The Garden Inn.

32.

While at The Garden Inn, Plaintiff's trafficker directed her to charge approximately $200 for an hour of commercial sex acts. Some buyers purchased an hour or more, while others purchased smaller blocks of time and paid less than $200. Plaintiff's trafficker directed Plaintiff to earn at least $1,000.00 each day.

33.

Over the weeks and months that Plaintiff was trafficked at The Garden Inn, hundreds of men visited rooms in which Plaintiff was trafficked at The Garden Inn to purchase sex with Plaintiff, other women and girls trafficked by her trafficker, and/or to purchase drugs from her trafficker.

34.

The money paid to Plaintiff by buyers of commercial sex acts was collected and kept by Plaintiff's trafficker.

35.

Plaintiff's trafficker controlled, directed, monitored, oversaw, and profited from her commercial sex acts at The Garden Inn, and he recruited, enticed, harbored,

transported, provided, obtained, advertised, maintained, and falsely imprisoned Plaintiff for commercial sex acts at The Garden Inn.

36.

In 2018, Plaintiff's trafficker pled guilty in federal court to trafficking Plaintiff.

37.

During the relevant period, J.G. had many interactions with Defendant Shetty, who she knew as "Sasha." Defendant Shetty managed The Garden Inn.

38.

Defendants called J.G. and other girls being trafficked at The Garden Inn, "working girls," because men continuously visited The Garden Inn and paid Plaintiff and other women and girls to have sex there.

39.

Defendants were aware of the high volume of sex and drug buyers visiting the rooms used by Plaintiff's trafficker, including the rooms in which Plaintiff was exploited.

40.

Defendants charged Plaintiff's trafficker more than the advertised room rate to rent rooms at the hotel.  In exchange for the profit, Defendants allowed Plaintiff's trafficker to carry out his booming sex and drug trafficking businesses at the hotel

for weeks and months at a time, which included his sex trafficking of Plaintiff at The Garden Inn.

41.

Plaintiff's trafficker used force, fraud, and coercion to sex traffic Plaintiff at The Garden Inn. He was verbally and physically abusive and threatened Plaintiff at The Garden Inn, including in common areas.

42.

Defendants saw Plaintiff's trafficker beat J.G., and other girls, and saw the evidence of his physical abuse, but did nothing about it. Instead, Defendants continued calling Plaintiff one of the "working girls" at The Garden Inn, and continued renting rooms to Plaintiff's trafficker for a premium—*i.e.*, more than the posted room rate—because the illicit cash businesses (drug and sex trafficking) occurring in those rooms was booming, and Defendants were profiting from them.

43.

After Plaintiff's trafficker brutally beat her inside a hotel room at The Garden Inn, Plaintiff went to the front desk for help. Defendants told Plaintiff's trafficker where Plaintiff had fled.

44.

On multiple occasions, Plaintiff asked Defendants for a room on the opposite side of the hotel to hide from her trafficker, and Defendants told her trafficker where

she was hiding.

45.

On other occasions, Defendants saw J.G. running into a room and shutting and locking the door, and then saw her trafficker pounding on the door to be let in.

46.

Defendants provided protection and cover for Plaintiff's trafficker, and for other traffickers, and acted as lookouts for them to warn them of risks to their illicit operations. Upon information and belief, in 2014, following an assault at the hotel, the Union City Police Department responded, and Defendants reported to the police department that Plaintiff's trafficker was an "employee" at the hotel who had helped to "mediate" the dispute. Upon information and belief, Plaintiff's trafficker did not work at the hotel and had not mediated any dispute. Defendants sought to protect Plaintiff's trafficker from responsibility for his criminal activities on the property, and to act as a lookout for him.

47.

Likewise, the Union City Police Department came to the hotel twice in April 2016 for incidents involving Plaintiff's trafficker. The first involved his alleged rape of another guest. The other involved his alleged involvement with a missing 16-year-old who was posted on Backpage (a website for commercial sex advertisements). The hotel reported that Plaintiff's trafficker had "checked out the

previous morning." But Plaintiff's trafficker continued to use the hotel throughout 2016, 2017, and 2018 to run his booming drug and sex trafficking businesses with Defendants' assistance and support.

48.

Plaintiff's trafficker regularly interacted with hotel staff, who accommodated his requests and thereby allowed, facilitated, and/or assisted Plaintiff's sex trafficking. Plaintiff's trafficker spoke to hotel employees, including Defendant Shetty to, among other things, reserve or pay cash for the rooms in which Plaintiff would be trafficked and to extend room reservations for additional nights to continue trafficking Plaintiff and other girls, and to sell drugs at The Garden Inn.

49.

Plaintiff and/or Plaintiff's trafficker rented rooms at The Garden Inn repeatedly and transacted business at The Garden Inn repeatedly over the course of the weeks and months he was trafficking Plaintiff and other girls at The Garden Inn. As such, Plaintiff's trafficker was known by Defendants' employees, agents, and/or representatives at The Garden Inn.

50.

During the relevant period, Defendants sold condoms at the front desk at The Garden Inn. Plaintiff and Plaintiff's trafficker purchased condoms from the front desk repeatedly.

51.

Before and after Plaintiff performed commercial sex acts at The Garden Inn, Plaintiff's trafficker: *recruited* Plaintiff at The Garden Inn to participate in commercial sex acts at The Garden Inn; *enticed* Plaintiff at The Garden Inn to participate in commercial sex acts at The Garden Inn; *harbored* Plaintiff at The Garden Inn for purposes of commercial sex transactions at The Garden Inn; *transported* Plaintiff to and around The Garden Inn for purposes of commercial sex transactions at The Garden Inn; *provided* Plaintiff at The Garden Inn to sex buyers for commercial sex transactions at The Garden Inn; *obtained* Plaintiff at The Garden Inn for commercial sex transactions at The Garden Inn; *advertised* Plaintiff at The Garden Inn for  commercial sex transactions at The Garden Inn; and *maintained* Plaintiff at The Garden Inn for  commercial sex transactions at The Garden Inn.[5]

---

[5] As alleged previously, Plaintiff was sex trafficked at The Garden Inn *both* when she engaged in commercial sex acts at The Garden Inn *and* before and after the commercial sex acts, when she was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited for commercial sex acts at The Garden Inn.

Defendants are liable under the beneficiary provision of 18 U.S.C. 1595(a) *both* because they knowingly benefited from selling rooms and goods to Plaintiff and her trafficker when Defendants knew or should have known Plaintiff was engaging in commercial sex acts at The Garden Inn through use of force, fraud, or coercion, *and* because they knowingly benefited from selling rooms and goods to Plaintiff and her trafficker when Defendants knew Plaintiff was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited for a commercial sex act at The Garden Inn through use of force, fraud, or coercion.

52.

During the relevant period, Defendants knew or should have known that Plaintiff was being sex trafficked at the hotel. Among other reasons, Defendants called Plaintiff and other victims at the hotel, "working girls"; rented rooms to Plaintiff's trafficker at a higher rate than advertised in exchange for allowing him to continue his illicit sex and drug trafficking business; helped Plaintiff's trafficker evade scrutiny and law enforcement; observed dozens and dozens of commercial sex buyers come and go from The Garden Inn after paying for commercial sex acts with Plaintiff and other girls at the hotel; observed Plaintiff's attire, appearance, behavior, and the room in which she was trafficked; observed her trafficker's attire, appearance, behavior, and room rental activity; went inside Plaintiff's rooms at the hotel, which included evidence of illicit activity, including cash, guns, drugs, and other paraphernalia; and observed Plaintiff living at the hotel and that she was beaten and threatened by her trafficker.

53.

Defendants failed to respond to the signs that it knew or should have known indicated that Plaintiff was a sex trafficking victim at The Garden Inn. Defendants failed to secure the property, including the common areas and approaches; monitor the property; train its staff; supervise its staff; and respond to visible, common-sense signs of sex trafficking.

54.

Defendants' staff assisted Plaintiff's trafficker by renting him or Plaintiff rooms while Defendants had actual or constructive knowledge that Plaintiff was sex trafficked in those rooms.

55.

On information and belief, Defendants reviewed hotel performance data, room occupancy data, profitability data, online reviews, and other performance metrics in connection with managing and/or operating The Garden Inn.

56.

On information and belief, Defendants turned a blind eye to safety and security issues at The Garden Inn when revenue was satisfactory, even when Defendants knew or should have known part of the revenue was derived from rental of rooms to Plaintiff and Plaintiff's sex trafficker, who were using the rooms to victimize Plaintiff.

57.

At all relevant times, Defendants received revenue from the operation of The Garden Inn, including through room rentals at The Garden Inn.  Defendants received revenue from renting the rooms in which Plaintiff was trafficked.

58.

As described in the foregoing paragraphs, Defendants knew or should have known that Plaintiff was a victim of sex trafficking who was being sex trafficked at The Garden Inn, over which Defendants exercised control.

59.

Defendants are liable to Plaintiff for violation of the TVPRA because Defendants (1) knowingly benefitted, (2) from taking part in a common undertaking or enterprise involving risk and potential profit (e.g., managing The Garden Inn for profit; operating The Garden Inn for profit; renting rooms at The Garden Inn for profit; selling goods, including condoms, at The Garden Inn for profit; renting rooms and selling goods for profit to Plaintiff's trafficker and Plaintiff), (3) that Defendants knew or should have known, (4) engaged in an act in violation of the TVPRA.

60.

The undertaking or enterprise violated the TVPRA as to the Plaintiff because she engaged in commercial sex acts dozens and dozens and dozens of times over weeks and months at The Garden Inn through her trafficker's use of "force, fraud, or coercion." ***Additionally, and separately***, the undertaking or enterprise also violated the TVPRA as to the Plaintiff because she was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited for commercial sex acts at The Garden Inn through use of "force, fraud, or coercion."

- 19 -

Consequently, Plaintiff was sex trafficked both when she engaged in commercial sex acts at The Garden Inn and through acts occurring prior and subsequent to her engagement in commercial sex acts (*i.e.*, when she was recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited for a commercial sex act at The Garden Inn).

**B.    Sex Trafficking, Prostitution, and Other Crimes were Frequent and Foreseeable at The Garden Inn.**

61.

The Garden Inn knew or should have known that its premises and approaches were rife with crime, including sex trafficking and prostitution, before, during, and after Plaintiff's sex trafficking.

62.

During the relevant period, commercial sex activity and drug activity was pervasive at The Garden Inn.  Many of the rooms rented each day at the Garden Inn were for "working girls" or their traffickers.  The hotel was busy with a high volume of visitors to the hotel coming and going for commercial sex and/or drug transactions.

63.

During the relevant period, multiple traffickers ran their trafficking businesses at The Garden Inn.  These traffickers loitered in The Garden Inn parking lot when their victims were engaged in frequent commercial sex acts during the daytime and

the nighttime at the hotel.

64.

During the relevant period, Plaintiff observed other women who were engaged in commercial sex activity at The Garden Inn. Plaintiff talked with other women engaged in such activities and witnessed them loitering in provocative clothing in The Garden Inn's breezeway, parking lot, and in doorways to solicit buyers.

65.

Publicly available information, including but not limited to online reviews relating to The Garden Inn, document pervasive criminal activity at the hotel, including commercial sex. Such information provided Defendants with actual or constructive knowledge of commercial sex at The Garden Inn as well as actual or constructive knowledge of the foreseeable risk of commercial sex at the hotel, including sex trafficking. For example, some publicly available customer reviews on Google.com and Booking.com state:

- "The hood was in the hotel. Drug Dealer, etc. Didn't feel safe at all." (Booking.com, Oct. 2016)

- "Crime infested". (Booking.com, Oct. 2016)

- A reviewer stated a Pro was "Being away from the Garden Inn with our lives", and a Con was "the unsafe and illegal element and activities…." (Booking.com, Jun. 2017)

- "Outside this hotel people were hanging out everywhere I serious I was really scared it was bad. It was so noisy a fight broke out between some girl and her boyfriend outside my room … This place is so bad never ever even think about going here …" (Google.com, 8 years ago)

- "This is the worst hotel I've ever stayed in … There was a wild sex party going on in the room next-door all night. Apparently it's that kind of hotel." (Booking.com, Oct. 2018)

- "This was the worst hotel I ever stayed at…. Pure nasty owners. The owners promote prostitution. The people that live there hang out in front of the establishment all evening …." (Google.com, 7 years ago)

- "Meanwhile the drug activity and criminal activities are real. I had a random guy knock on my door and wake my kids asking to buy drugs…" (Google.com, 6 years ago)

66.

Defendants knew or should have known of the online reviews about the property in connection with managing and/or operating The Garden Inn, and as such, knew or should have known about online reviews reporting pervasive crime, drugs, commercial sex crimes, loitering, and more at The Garden Inn, among other problems.

67.

Police visited the hotel repeatedly in connection with sex crimes. To give only a few examples to illustrate the point: Defendants knew or should have known of the following crimes, among others, occurring on The Garden Inn's premises and approaches when Plaintiff was sex trafficked at The Garden Inn based on publicly available police reports:

a. On August 19, 2015, the Union City Police Department responded to a call in reference to a rape in room 104 at The Garden Inn.

b. On September 18, 2015, the Union City Police Department responded to a call concerning a rape at gun point in room 219 at The Garden Inn.

c. On January 28, 2016, the "Union City Police Department Special Operations Group conducted a prostitution sting in conjunction with the Clayton County Sheriff Vice Unit in Union City, Fulton County, Georgia." As part of that prostitution sting, a woman was arrested in Room 216 of The Garden Inn after "undercover officers had made deals through phone and internet. These deals included solicitation of sexual acts for payment."

d. On May 11, 2016, the Union City Police Department along with undercover officers with the Clayton County Sheriff's Office VICE

Unit conducted a "prostitution detail" in Union City. "After agreeing to a sexual act and price, undercover and special operations officers made entry into the unit." One such unit was room 305 at The Garden Inn. Upon information and belief, the female arrested was a minor.

e.  On August 2, 2017, the Union City Police Department conducted another "prostitution operation" at The Garden Inn with the Clayton County Sheriff Office's vice unit. A female was arrested in room 309 and charged with prostitution and possession of cocaine.

68.

By failing to take reasonable, appropriate, sufficient, and necessary actions in response to widespread criminal activity at The Garden Inn generally, and in response to Plaintiff's sex trafficking at The Garden Inn specifically, Defendants' employees, agents, and/or representatives ignored, allowed, condoned, assisted, and/or facilitated Plaintiff's sex trafficking at The Garden Inn.

69.

As a direct and proximate result of Defendants' acts and omissions, and Plaintiff being trafficked for sex at The Garden Inn, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.  Such injuries and damages were reasonably foreseeable to Defendants.

- 24 -

## C.      Defendants' Knowledge of Sex Trafficking

70.

Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in 2000, the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons, and the passage of O.C.G.A. § 16-5-46 in 2007.

71.

Defendants knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

72.

Defendants knew or should have known the following: the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation … Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[6]

---

[6] https://polarisproject.org/hotels-motels-recommendations/ (last visited Aug. 29, 2025).

- 25 -

73.

Defendants knew or should have known that attorneys for the hotel industry estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels,[7] and that the industry had been warned, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[8]

74.

Defendants knew or should have known that the United States Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking.  DHS's guidelines state that, "[a]s a hospitality industry professional, you are in a unique position to recognize and report potential human trafficking violations."[9]  The guidelines set forth common-sense signs that vigilant housekeeping, maintenance, front desk, and security can identify.

75.

Defendants knew or should have known of the prevalence of sex trafficking in the hospitality industry, knew or should have known of the free and easy access

---

[7] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference 2013, Washington, D.C., http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983.
[8] *Id.*
[9] https://www.dhs.gov/sites/default/files/2025-06/25_0605_bc_hospitality-toolkit-v02-508.pdf (last visited August 29, 2025).

to training and materials on how to prevent sex trafficking at The Garden Inn, and knew or should have known of common signs of sex trafficking and how to identify, address, and deter it.

76.

Defendants knew or should have known that, on September 15, 2013, the Georgia legislature passed O.C.G.A. § 16-5-47 requiring hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted." The contents of the notice are prescribed by statute but must "provide information giving individuals a method to contact the National Human Trafficking Hotline and the Statewide Georgia Hotline for Domestic Minor Trafficking." Failure to comply with O.C.G.A. § 16-5-47 is a misdemeanor.

77.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at The Garden Inn. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the, if not the, largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex

trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[10]  Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiff and others.

78.

Defendants knew or should have known that in 2018 the National Human Trafficking Hotline ranked Georgia fourth among states in human trafficking.[11]

79.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking…."[12]

---

[10] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited August 29, 2025); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited August 29, 2025).

[11] Anna Varela, *Human Trafficking Ensnares More Than Half of Metro Atlanta's Homeless Youth, Georgia State Study Shows*, Georgia State University, (Oct. 21, 2019) https://news.gsu.edu/2019/10/21/homeless-youth-trafficking/ (last visited August 29, 2025).

[12] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited August 29, 2025).

## COUNT I
## STATUTORY LIABILITY
## 18 U.S.C. § 1595

80.

Plaintiff incorporates Paragraphs 1 through 81 as if fully restated herein verbatim.

81.

In violation of the TVPRA, 18 U.S.C. § 1595(a), Defendants knowingly benefitted from taking part in a common undertaking or enterprise involving risk and potential profit that Defendants knew or should have known engaged in an act in violation of the TVPRA.

82.

Defendants knowingly benefitted by receiving a percentage of the revenue generated by the operation of The Garden Inn during the relevant period, including receiving a percentage of the revenue generated from renting the rooms in which Plaintiff was trafficked and from selling goods to Plaintiff's trafficker and Plaintiff.

83.

Defendants took part in a common undertaking or enterprise involving risk and potential profit by, among other things, operating The Garden Inn, which had an extensive history of pervasive crime and commercial sex activities, without needed security measures, and engaging in ongoing business transactions with Plaintiff's

trafficker (e.g., room rentals, sale of condoms and other goods) for days and weeks, notwithstanding that Defendants knew or should have known about his rampant criminal activities on the property and exploitation of Plaintiff.

84.

The venture in which Defendants participated was in or affecting interstate commerce.

85.

Defendants knew or should have known the common undertaking or enterprise involving risk and potential profit engaged in acts in violation of the TVPRA because Defendants, and their employees, agents, and representatives, had repeated opportunities to observe Plaintiff and did observe Plaintiff at the hotel, with and without her trafficker, and with other victims. Further, Defendants, and their employees, agents, and representatives, had the opportunity to observe the signs of sex trafficking exhibited by Plaintiff, her trafficker's activities, the rooms in which Plaintiff was trafficked, and the frequent traffic of adult male buyers to Plaintiff's rooms and to the hotel parking lot. Plaintiff talked to multiple employees, agents, and representatives of the Defendants, including Defendant Shetty a/k/a "Sasha," on multiple occasions at The Garden Inn.

86.

Further, Defendants knew or should have known the common undertaking or enterprise involving risk and potential profit engaged in an act in violation of the TVPRA because Defendants, and their employees, agents, and representatives, knew or should have known of pervasive commercial sex crimes at the hotel before, during, and after Plaintiff was trafficked for sex at The Garden Inn, and furthermore, knew that the hotel had not taken any steps in response to address such pervasive crimes.

87.

Defendants are directly and vicariously liable under § 1595(a) for the actions of their employees, agents, and representatives.

88.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' taking part in a common undertaking or enterprise involving risk and potential profit that it knew or should have known engaged in an act in violation of the TVPRA.

89.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

90.

Defendants are jointly and severally liable for damages arising from the indivisible injuries Defendants caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## DAMAGES

91.

Plaintiff incorporates Paragraphs 1 through 92 as if fully set forth herein.

92.

As a proximate and foreseeable result of Defendants' conduct and violations of the TVPRA, Plaintiff sustained personal injuries, mental and emotional pain and suffering, mental anguish, and other damages as will be proven at trial. Plaintiff seeks to recover all compensatory, special, actual, economic, consequential, general, punitive, and all other damages permissible under federal law, including, but not limited to:

a)   Personal injuries;

b)   Past, present, and future conscious pain and suffering;

c)   Loss of enjoyment of life;

d)   Medical expenses;

e)   Mental anguish and emotional distress;

f)   Loss of past, present, and future wages;

g)    Incidental expenses; and

h)    Consequential damages to be proven at trial.

93.

Plaintiff is entitled to an award of punitive damages without limitation or cap because Defendants' actions and their employees, agents, and representatives were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

94.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action.  Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a)    Process issue as provided by law;

b)    Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

c)    Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages from Defendants in accordance with the enlightened conscience of an impartial jury;

d)    Plaintiff be awarded a trial by jury; and

e)    Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 29th day of August, 2025.

/s/ David H. Bouchard
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859
Oto U. Ekpo
oto@finchmccranie.com
Georgia Bar No. 327088

FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

Attorneys for Plaintiff

## CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing **Complaint** has been prepared with a font and point selection approved by the Court in LR 5.1., NDGA. Specifically, the above-mentioned pleading was prepared using Times New Roman font of 14-point size.

Respectfully submitted,

*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859
Oto U. Ekpo
oto@finchmccranie.com
Georgia Bar No. 327088

FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

Attorneys for Plaintiff